**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No.  23-cv-01595-NYW-JPO

PARKER NURSING AND REHAB CENTER, LLC, d/b/a THE SUITES PARKER,

Petitioner,

v.

ROBERT KEBRE, individually, and as Personal Representative of the Estate of SANDRA KEBRE,

Respondent.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter comes before the Court on the Motion to Compel Arbitration (or the "Motion") filed on January 19, 2024.  [Doc. 26].  Having considered the Motion and the associated briefing, the applicable case law, and the entire docket, the Motion to Compel Arbitration is respectfully **DENIED**.

**BACKGROUND**

Sandra Kebre ("Ms. Kebre") was a resident of Parker Nursing and Rehab Center, LLC, d/b/a The Suites Parker ("Petitioner" or "Parker") from approximately April 15, 2022 until May 31, 2022.  [Doc. 10 at ¶ 6].[1]  Ms. Kebre's son, Robert Kebre ("Respondent" or "Mr. Kebre"), filled out paperwork in conjunction with Ms. Kebre's admission to Parker; this paperwork included an Alternative Dispute Resolution Agreement (the "Arbitration Agreement").  [*Id.* at ¶ 22; Doc. 26-3 at 38–41].

---

[1] The Amended Petition inadvertently appears twice on the docket at [Doc. 10] and [Doc. 16].  The Court cites to [Doc. 10] when referencing the Amended Petition.

The Arbitration Agreement governs "any and all disputes arising out of or in any way relating to this Agreement or to the [r]esident's stay at the Facility . . . that would constitute a legally cognizable cause of action in a court of law sitting in the State of Utah where Facility is located," including claims alleging "a violation of a right claimed to exist under federal, state or local law"; "tort"; "negligence; gross negligence; malpractice; and any alleged departure from any applicable federal, state, or local medical, health care, consumer, or safety standards." [Doc. 26-3 at 39]. It provides that Parker and the resident—which includes the resident's "next of kin, guardian, executor, administrator, legal representative, or heir," and "any person who has executed th[e] Agreement" on behalf of the resident—"agree that any disputes covered by th[e] Agreement . . . that may arise between them shall be resolved exclusively by an ADR process," and that the "ADR process shall include mediation, and where mediation is not successful, binding arbitration." [*Id.* at 38].

Ms. Kebre passed away on June 7, 2022. [Doc. 10 at ¶ 6]. On April 18, 2023, Mr. Kebre filed a lawsuit against Parker in the District Court for Douglas County, Colorado, asserting claims for negligence, a violation of the Colorado Consumer Protection Act, and wrongful death. [Doc. 26-1 at 3, 15, 24, 26]. In that lawsuit, Mr. Kebre alleges that Parker's negligence in supervision, staffing, care, and treatment caused Ms. Kebre's death. [*Id.* at ¶¶ 18–26, 67–127]. Parker, alongside Brett Ottley ("Mr. Ottley"), Parker's "administrator," subsequently initiated this action in federal court by filing a Petition to Compel Arbitration. [Doc. 1 at 1]. After Respondent moved to dismiss the case for lack of subject matter jurisdiction under 28 U.S.C. § 1332, Parker filed its First Amended

2

Petition to Compel Arbitration, dropping Mr. Ottley as a petitioner. [Doc. 10 at 1].[2] Respondent answered the Amended Petition and demanded a jury trial "regarding the making of the arbitration agreement." [Doc. 17 at ¶ 115].

By order of this Court, Petitioner filed its Motion to Compel Arbitration on January 19, 2024, [Doc. 26], which is fully briefed, *see* [Doc. 28; Doc. 29]. No Party has requested oral argument or an evidentiary hearing in this matter, *see* [Doc. 26; Doc. 28], and the Parties represented in their December 20, 2023 Joint Status Report that they "do not believe that a Scheduling Order and discovery are necessary in this matter," [Doc. 24 at ¶ 3]. The matter is ripe for resolution and the Court addresses the Parties' arguments below.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that contractual agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition [a] United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* § 4. The court must

---

[2] Typically, a federal court's jurisdiction is based on the facts as they existed at the time the initiating document was filed. *Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957). There is one exception to this rule: "A district court can dismiss a dispensable nondiverse party pursuant to Fed. R. Civ. P. 21 to cure a jurisdictional defect at any point in the litigation, including after judgment has entered." *Ravenswood Inv. Co., L.P. v. Avalon Corr. Servs.*, 651 F.3d 1219, 1223 (10th Cir. 2011); *see also Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 573 (2004). Accordingly, while complete diversity did not exist at the time Parker initiated this action, this does not negate the Court's federal diversity jurisdiction since the jurisdictional defect has since been cured.

hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

*Id.* But if the "making of the arbitration agreement" is at issue, then "the court shall proceed summarily to the trial thereof." *Id.*

"The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997). Whether a valid arbitration agreement exists is a threshold determination "presumptively for courts to decide." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013).

"When the parties dispute whether an arbitration agreement exists, the party moving to compel arbitration bears a burden similar to the one a summary judgment movant faces—it must make an initial showing that a valid arbitration agreement exists." *Hutton & Hutton L. Firm, LLC v. Girardi & Keese*, 96 F. Supp. 3d 1208, 1228 (D. Kan. 2015) (citing *Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012)); *see also Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014) ("[T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement."). "If the moving party carries this burden, the burden shifts to the non-moving party to show a genuine issue of material of fact about the formation of the agreement to arbitrate." *Hutton & Hutton*, 96 F. Supp. 3d at 1228. If genuine disputes of material fact exist, the FAA "calls for a summary trial." *Bellman*, 563 F. App'x at 612. But if there are no material disputes of fact, the court may "resolve the arbitration question by ruling on a motion to compel, rather than conducting a summary trial." *Id.*

4

**ANALYSIS**

The Parties' dispute boils down to one question:  whether Mr. Kebre had authority to bind Ms. Kebre to the Arbitration Agreement when he signed it alongside her other admission paperwork.   In other words, the Parties disagree about whether a valid arbitration agreement exists, because if Mr. Kebre had authority to bind Ms. Kebre, the Arbitration Agreement is valid; if he did not, it is not.

**A.     Colorado Contract Law and Agency Law Principles**

Whether an agreement to arbitrate exists "is simply a matter of contract between the parties." *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013) (quotation omitted).  Accordingly, courts apply "ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute." *Id.* (quotation omitted).  The Parties appear to agree that Colorado law applies here.  *See, e.g.*, [Doc. 26 at 10; Doc. 28 at 3–4]; *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

Under Colorado law, "a contract requires mutual assent to an exchange between competent parties for legal consideration," *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022), i.e., a "meeting of the minds" among the contracting parties, *Bellman*, 563 F. App'x at 613 (quotation omitted).  Under the doctrine of agency, which "attributes the legal consequences of one person's action to another person," *State Farm Mut. Auto. Ins. Co. v. Johnson*, 396 P.3d 651, 655 (Colo. 2017), an agent may enter into a contract on behalf of its principal, thereby binding the principal to the terms of the contract, *see, e.g.*, *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 230 (Colo.

5

2018).  The existence and scope of an agency relationship is generally a question of fact, though it may be resolved as a matter of law when the facts are not in dispute.  *Fresquez v. Trinidad Inn, Inc.*, 521 P.3d 399, 404 (Colo. App. 2022).  "Authority to act on behalf of another can be actual or apparent."  *Villalpando v. Denver Health & Hosp. Auth.*, 181 P.3d 357, 362 (Colo. App. 2007).

Actual authority exists "when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."  *Johnson*, 396 P.3d at 656 (quoting Restatement (Third) of Agency, § 2.01).  Actual authority depends on the "principal's expressive conduct toward an agent, through which the principal manifests assent to be affected by the agent's action, and the agent's reasonable understanding of the principal's manifestation."  *Fresquez*, 521 P.3d at 405 (quotation omitted).  Actual authority thus contains both an objective and a subjective component:  "the agent must subjectively hold the belief that he possesses authority, and that belief must be objectively reasonable in light of the principal's actions."  *Id.* (cleaned up).  Actual authority may be express, such as when "the principal directly states that its agent has the authority to perform a particular act on the principal's behalf," or implied, which includes the "authority to do 'those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent.'"  *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994) (quoting *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988)).

On the other hand, apparent authority "is the power held by an agent or other actor to affect a principal's legal relations with third parties *when a third party reasonably*

*believes* the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Fresquez*, 521 P.3d at 406 (quoting Restatement (Third) of Agency, § 2.02). Apparent authority "flows only from the acts and conduct of the principal," *Johnson*, 396 P.3d at 656 (quotation omitted), and may be established "by proof of 'written or spoken words or other conduct of the principal which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person purporting to act for him,'" *Villalpando*, 181 P.3d at 363 (quoting *Lucero v. Goldberger*, 804 P.2d 206, 209 (Colo. App. 1990)). The doctrine of apparent authority "protects third parties who, in good faith, rely on their belief that an agency relationship exists between the apparent principal and agent." *Id.*

### B.    The Powers of Attorney

The Parties' arguments about whether Mr. Kebre had authority to bind Ms. Kebre to the Arbitration Agreement rest on Petitioner's Exhibit D, which both Parties refer to generally as the "power of attorney" or "POA." *See, e.g.*, [Doc. 26 at 11–12; Doc. 28 at 4–11]; *see also* [Doc. 26-4 (Exhibit D)]. "A power of attorney is an instrument by which a principal confers express authority on an agent to perform certain acts or kinds of acts on the principal's behalf," *Matter of Tr. of Franzen*, 955 P.2d 1018, 1021 (Colo. 1998), and the execution of the document creates a principal-agent relationship, *Moffett v. Life Care Ctrs. of Am.*, 187 P.3d 1140, 1144 (Colo. App. 2008), *aff'd*, 219 P.3d 1068 (Colo. 2009). Powers of attorney are "strictly construed." *People v. Stell*, 320 P.3d 382, 385 (Colo. App. 2013).

On July 6, 1994, Ms. Kebre executed a "Durable Power of Attorney for Health Care Decisions" (the "Health Care POA"), which appears to be a form power of attorney

provided by the California Medical Association.  [Doc. 26-4 at 1, 3].  The Health Care POA

states, in relevant part:

> 1.  CREATION OF DURABLE POWER OF ATTORNEY FOR HEALTH CARE
>
> By this document I intend to create a durable power of attorney by appointing the person designated below to make health care decisions for me as allowed by Sections 2410 to 2444, inclusive, of the California Civil Code.
>
> . . .
>
> 3.  AUTHORITY OF AGENT
>
> If I become incapable of giving informed consent to health care decisions, I grant my agent full power and authority to make those decisions for me, subject to any statements of desires or limitations set forth below.  Unless I have limited my agent's authority in this document, that authority shall include the right to consent, refuse consent, or withdraw consent to any medical care, treatment, service, or procedure. . . .

[*Id.* at 1–2].  In the Health Care POA, Ms. Kebre appointed Mr. Kebre and Michelle Wilfong

"as [her] agent (attorney-in-fact) to make health care decisions for [her] as authorized in

this document."  [*Id.* at 1].

Then, on August 7, 2012, Ms. Kebre signed a "State of Colorado Statutory Form

Power of Attorney" (the "Statutory POA").  [*Id.* at 7].  Only two nonsequential pages from

the Statutory POA have been provided to the Court.  *See* [*id.* at 6–7 (listed as "Page 2

of 6" and "Page 4 of 6")].  The portion provided contains a section titled "GRANT OF

GENERAL AUTHORITY," which states:

> I grant my agent and any successor agent general authority to act for me with respect to the following subjects as defined in the Uniform Power of Attorney Act, part 7 of article 14 of title 15, Colorado Revised Statutes:
>
> (INITIAL each subject you want to include in the agent's general authority. If you wish to grant general authority over all of the subjects you may initial All preceding subjects instead of initialing each subject.)

(__)  Real property
(__)  Tangible personal property
(__)  Stocks and bonds
(__)  Commodities and options
(__)  Banks and other financial institutions
(__)  Operation of entity or business
(__)  Insurance and annuities
(__)  Estates, trusts, and other beneficial interests
(__)  Claims and litigation
(__)  Personal and family maintenance
(__)  Benefits from governmental programs or civil or military service
(__)  Retirement plans
(__)  Taxes
(__)  All preceding subjects

[*Id.* at 6].  Ms. Kebre placed her initials on the lines for "Real property," "Tangible personal property," "Banks and other financial institutions," "Insurance and annuities," "Retirement plans," and "All preceding subjects."  [*Id.*].  Notably, the Statutory POA's two provided pages do not designate anyone as Ms. Kebre's "agent" or otherwise identify her "agent" for purposes of the "GRANT OF GENERAL AUTHORITY" section.  *See* [*id.* at 6–7].  Nor does the Statutory POA ever reference the Health Care POA.  *See* [*id.*].

While the Parties both present the Health Care POA and the Statutory POA together, [Doc. 26 at 11–12; Doc. 28 at 4–11]; *but see* [Doc. 29 at 3 (Petitioner arguing in its Reply that "[t]he [Health Care] POA *and* the grant of general authority," i.e., the Statutory POA, "*together* authorized Mr. Kebre to . . . enter into the Arbitration Agreement on Ms. Kebre's behalf" (emphasis added))], the Court observes that these are two distinct documents, executed 18 years apart, and there is nothing in the record (or in any argument from the Parties) demonstrating that the Statutory POA was intended as any sort of amendment to or continuation of the Health Care POA, or otherwise showing that the two documents can and should be construed together.  Rather, the documents appear

9

to be separate POAs, covering different topics, that are independent of each other. Indeed, the Colorado Uniform Power of Attorney Act—the statute from which Ms. Kebre's Statutory POA appears to be derived, *compare* [Doc. 26-4 at 6–7], *with* Colo. Rev. Stat. § 15-14-741 (setting out a statutory form power of attorney and providing that "[a] document substantially in the following form may be used to create a statutory form power of attorney that has the meaning and effect prescribed by this part 7")—applies to "all powers of attorney *except* . . . [a] power to make health-care decisions."  Colo. Rev. Stat. § 15-14-703(1)(b) (emphasis added).

Accordingly, absent any explanation from the Parties about how these documents affect the other, the Court is left to conclude that Petitioner has submitted *two* POA documents to the Court:  (1) the Health Care POA, which appears to be complete, and (2) the Statutory POA, which appears to be incomplete.  With this in mind, the Court turns to the Parties' arguments.

### C.    Whether Mr. Kebre Had Authority to Bind Ms. Kebre to Arbitration

#### 1.    Actual Authority

Parker argues that Mr. Kebre had actual authority to enter into the Arbitration Agreement on Ms. Kebre's behalf because "Ms. Kebre expressly authorized Mr. Kebre to act on her behalf in all respects as her POA, and she provided Mr. Kebre the power to enter into contracts on [her] behalf."  [Doc. 26 at 11].  In support of this statement, Parker directs the Court to the Statutory POA, where Ms. Kebre placed her initials next to the "All preceding subjects" line.  [*Id.* (citing [Doc. 26-4 at 6])].  Petitioner contends that this act by Ms. Kebre constitutes a grant of either an express or implied actual authority to Mr. Kebre for *all* of the topics listed on that page, including "Claims and litigation," which it

10

contends provided Mr. Kebre authority "to enter into contracts like the Arbitration Agreement" on Ms. Kebre's behalf.   [*Id.* at 11–12].

Mr. Kebre disputes that he had actual authority to enter into the Arbitration Agreement.  He raises several arguments in opposition:  (1) "the power of attorney . . . was not operative" at the time Mr. Kebre signed the Arbitration Agreement because it applied only if Ms. Kebre became "incapable of giving informed consent to health care decisions," and at the time the Agreement was signed, Ms. Kebre was capable of giving informed consent, [Doc. 28 at 5–6 (quotation omitted)]; (2) "the power of attorney expressly withheld . . . authority over 'claims and litigation,' including arbitration," [*id.* at 6–8]; and (3) even "assuming that the power of attorney had been properly activated by Ms. Kebre's incapacity, any authority to make healthcare decisions does not extend to the authority to agree to arbitration," [*id.* at 8–11].

**The Health Care POA.**  While Petitioner clarifies in its Reply that it does not rely on the Health Care POA *alone* in its actual authority argument, *see* [Doc. 29 at 3 (the Health Care POA and the Statutory POA "together authorized Mr. Kebre to . . . enter into the Arbitration Agreement on Mr. Kebre's behalf")], the Court nevertheless finds it necessary to discuss the two POAs separately, given that they are separate documents and no Party has explained to the Court why they should—or even could—be construed together.  To the extent Petitioner does or could rely on the Health Care POA to argue that Mr. Kebre had actual authority to enter into the Arbitration Agreement, the Court respectfully disagrees that this document is sufficient to show actual authority.  As Respondent points out, the Health Care POA is to be effective only in the event that the signatory "become[s] incapable of giving informed consent to health care decisions,"

11

[Doc. 26-4 at 2], and there is no evidence in the record showing that Ms. Kebre was incapable of giving informed consent at the time Mr. Kebre signed the Arbitration Agreement. Indeed, the Parties appear to agree that Ms. Kebre was "cognitively capable of making decisions on her own and providing informed consent." [Doc. 29 at 6]; *see also* [Doc. 28 at 5–6]. Furthermore, the Health Care POA designates Mr. Kebre as Ms. Kebre's agent to make "health care decisions," [Doc. 26-4 at 1], and Petitioner does not argue that entering into the Arbitration Agreement amounts to a "health care decision," *see generally* [Doc. 26]; *cf. Fresquez*, 521 P.3d at 409 ("[A]n agent's authority to make decisions regarding a patient's 'medical treatment' does not encompass the authority to sign an arbitration agreement."). Petitioner has not shown actual authority arising from the Health Care POA.

**The Statutory POA.** Petitioner more plainly relies on the Statutory POA, arguing that by initialing next to the "All preceding subjects" line, Ms. Kebre authorized Mr. Kebre to act on her behalf for all listed topics, including "Claims and litigation." [Doc. 26 at 11]. Mr. Kebre views the Statutory POA differently; he argues that because Ms. Kebre declined to place her initials next to the "Claims and litigation" line, she "chose to withhold from [Mr. Kebre] power over" that subject, and the Statutory POA should be construed narrowly in favor of the more limited grant of authority. [Doc. 28 at 6–8]. Neither Party expressly argues, however, that there is any factual dispute over Ms. Kebre's intent that must be decided by a factfinder (here, a jury).

To be sure, Ms. Kebre's intent with respect to the grant of general authority on the first provided page of the Statutory POA is not clear. However, notwithstanding the Parties' disagreement about what Ms. Kebre intended or the effect of her selective

initialing, this issue is ultimately not relevant to the Court's analysis because there is *nothing* in the Statutory POA—or elsewhere in the record—that designates *Mr. Kebre* as Ms. Kebre's agent for purposes of the Statutory POA.

As explained above, the Court has only been provided with two nonsequential pages of the Statutory POA, neither of which names Mr. Kebre as Ms. Kebre's agent. [Doc. 26-4 at 6–7]. It is not clear whether other pages of Ms. Kebre's Statutory POA exist and have simply not been provided to the Court, or whether Ms. Kebre only ever completed the provided pages. The Court notes, though, that Colorado's statutory form power of attorney, which the Statutory POA plainly mirrors, does contain a "DESIGNATION OF AGENT" section in which the principal may "name the following person as [her] agent," Colo. Rev. Stat. § 15-14-741, and that this section is not included in the two pages from the Statutory POA provided to the Court, [Doc. 26-4 at 6–7].

In any event, the bottom line is that the Statutory POA contains no designation of Mr. Kebre as the "agent" referenced in the "GRANT OF AUTHORITY" section; instead, it designates only a "Kathy Kebr" [sic] as a "successor agent." [*Id.* at 6]. Nor has Petitioner directed the Court to any other evidence demonstrating that Mr. Kebre is an "agent" as contemplated in the Statutory POA. If Ms. Kebre designated Mr. Kebre as her agent for purposes of the Statutory POA, the Court has no evidence of it. In other words, even if Petitioner is correct that, by initialing next to "All preceding subjects," Ms. Kebre intended to grant her agent authority over "Claims and litigation" (and, as a result, authority to enter into the Arbitration Agreement), there is nothing showing that this authority was granted to *Mr. Kebre*, and there is thus no evidence of Ms. Kebre's "expressive conduct toward" Mr. Kebre through which she "manifest[ed] assent to be affected by [Mr. Kebre's] action,"

13

*Fresquez*, 521 P.3d at 405, as required to show actual authority.[3]  Petitioner has therefore

not met its burden to demonstrate that, through the Statutory POA, which must be "strictly

construed," *Stell*, 320 P.3d at 385, Mr. Kebre had actual authority to enter into the

Arbitration Agreement.

### 2.    Apparent Authority

Next, Petitioner argues that if Mr. Kebre did not have actual authority to bind Ms.

Kebre to the Arbitration Agreement, he at least had apparent authority to do so.  Parker

argues that it "reasonably believed Mr. Kebre could execute the Arbitration Agreement on

Ms. Kebre's behalf because Mr. Kebre was designated as Ms. Kebre's agent and power

of attorney," citing to the Health Care POA and Statutory POA without differentiating

between the two.  [Doc. 26 at 12].  It also asserts that there is "no evidence Ms. Kebre

objected to [Parker] staff about Mr. Kebre signing documents on her behalf, or that Ms.

Kebre withdrew Mr. Kebre's agency authority in the presence of [Parker] staff."  [*Id.*].

Respondent disagrees that this is enough to show apparent authority.  He contends that

there is no evidence that "anyone from [Parker] met with or spoke with Ms. Kebre and

obtained confirmation that Mr. Kebre was authorized as her agent" and that the "power of

attorney was insufficient as a matter of law to authorize Mr. Kebre to sign the arbitration

agreement as Ms. Kebre's agent."  [Doc. 28 at 12].

It is Petitioner's burden to come forward with "evidence sufficient to demonstrate

the existence of an enforceable agreement," *Bellman*, 563 F. App'x at 612, which for

---

[3] The Statutory POA does indicate that Ms. Kebre nominated Mr. Kebre as the conservator of her estate and guardian of her person, [Doc. 26-4 at 7], but nothing indicates that Mr. Kebre was, with respect to the grant of general authority, designated Ms. Kebre's agent for those purposes, [*id.* at 6–7].

14

apparent authority means evidence of "written or spoken words or other conduct *of the principal*," *Villalpando*, 181 P.3d at 363 (quotation omitted and emphasis added); *see also Lucero*, 804 P.2d at 209 (apparent authority "is created by written or spoken words or other conduct *of the principal* which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person purporting to act for him").  Therefore, this Court focuses on *Ms. Kebre's* actions—not her son's.  For this reason, Petitioner cannot demonstrate apparent authority by relying on a purported *lack* of evidence of Ms. Kebre's opposition to Mr. Kebre acting on her behalf,[4] particularly where Petitioner has cited no evidence that Ms. Kebre knew of the existence of the Arbitration Agreement.  *Cf. Fresquez*, 521 P.3d at 410 (finding that care home patient's son did not have apparent authority to bind his mother to an arbitration agreement and noting that "the record does not contain any evidence suggesting that [the patient] ever learned of the existence of the arbitration agreement").[5]  In effect, then, Petitioner's argument in support of apparent authority relies exclusively on its assertion that "Mr.

---

[4] The Court notes that the Parties agreed that discovery is not "necessary in this matter." [Doc. 24 at ¶ 3].

[5] *But see Bethany Nursing & Rehab Ctr., LLC v. Amaro*, No. 22-cv-03138-RM-SBP, 2024 WL 1286257, at *8 (D. Colo. Mar. 11, 2024) (holding that based on the actions of the daughter-agent and the acquiescence of parent-principal, there was no genuine issue of material fact as to apparent authority of a daughter to agree to a nursing home arbitration agreement), *report and recommendation adopted*, 2024 WL 1282347 (D. Colo. Mar. 26, 2024).  *Amaro* was issued after the Parties competed briefing in this action, but this Court does not follow its holding for a number of reasons.  First, although this Court has the utmost respect for its judicial colleagues, it is not bound by their decisions.  *See United States v. Rhodes*, 834 F. App'x 457, 462 (10th Cir. 2020) ("[D]istrict courts in this circuit are bound by [Tenth Circuit] decisions and those of the United States Supreme Court— they are not bound by decisions of other district courts.").  Second, the contractual language relied upon by the *Amaro* court is different than the language at issue here. Third, as discussed above, there is no evidence demonstrating Ms. Kebre's actions, even assuming acquiescence was sufficient for apparent authority.

Kebre was designated as Ms. Kebre's agent and power of attorney." [Doc. 26 at 12]. But for the reasons set forth above, neither the Health Care POA nor the Statutory POA constitutes acts or words of Ms. Kebre that could cause Petitioner to *reasonably* believe that Mr. Kebre had authority to act on Ms. Kebre's behalf "regarding arbitration." *Fresquez*, 521 P.3d at 406, 410. The Court cannot ignore the contents—and deficiencies—of the Health Care POA and the Statutory POA, which do not provide Mr. Kebre authority to enter into an arbitration agreement on Ms. Kebre's behalf. And as Respondent notes, Petitioner directs the Court to no other evidence of Ms. Kebre's words or conduct that could cause a person to reasonably believe that Ms. Kebre consented to Mr. Kebre entering the Arbitration Agreement on her behalf. *See* [Doc. 26 at 12]; *cf. Fresquez*, 521 P.3d at 410 (finding no apparent authority where there was no evidence that "suggested [the patient] was aware of the arbitration agreement or that she intended to grant [her son] the authority to sign away her right to a trial in a court of law").

In its reply brief, Petitioner argues that Mr. Kebre had apparent authority to enter into the Arbitration Agreement because he "executed several documents as Ms. Kebre's agent, including the admission agreement, all admissions paperwork, authorizations for release of information, and the arbitration agreement." [Doc. 29 at 5]. This argument is waived because it was not raised in Petitioner's affirmative Motion. *See White v. Chafin*, 862 F.3d 1065, 1067 (10th Cir. 2017). Moreover, the Arbitration Agreement on its face recognizes that it is different than other parts of the admission packet by stating in all capitals: "THIS AGREEMENT IS NOT A CONDITION OF ADMISSION TO OR CONTINUED RESIDENCE IN THE FACILITY. THE AGREEMENT IS OPTIONAL FOR BOTH YOU AND HIGHLAND [sic]. YOU DO NOT HAVE TO AGREE TO ARBITRATION

IN ORDER TO RECEIVE ADMISSION OR MEDICAL TREATMENT." [Doc. 26-3 at 38]. In addition, Petitioner asserts that, by signing the Arbitration Agreement, Mr. Kebre agreed that he had "carefully and thoroughly reviewed" the Arbitration Agreement and "acknowledge[d] . . . and agree[d] with the information provided." [Doc. 29 at 5 (quoting [Doc. 26-3 at 40])]. Setting aside the fact that this argument is also waived, *White*, 862 F.3d at 1067, the Court is respectfully unpersuaded by the contention, which relies on *Mr. Kebre's acts* in signing the admission forms, not "the acts and conduct of the principal," Ms. Kebre. *Johnson*, 396 P.3d at 656; *see also Fresquez*, 521 P.3d at 410 (concluding that even where son had authority to make "decisions related to [his mother's] admission and care" at the facility, the defendant "could not have reasonably believed that [the son] also possessed apparent authority to sign the arbitration agreement on [her] behalf"). And as for Petitioner's argument that Ms. Kebre "acquiesced to her son's actions, including his execution of the voluntary Arbitration Agreement," [Doc. 29 at 6], there is again no evidence in the record that Ms. Kebre was aware of the Arbitration Agreement, let alone acquiesced to or approved of Mr. Kebre signing it.

In sum, Petitioner has not presented evidence showing that Mr. Kebre had actual or apparent authority to enter into the Arbitration Agreement and has thus not put forth "evidence sufficient to demonstrate the existence of an enforceable agreement," so the burden never shifted to Respondent to identify a genuine dispute of fact warranting a summary trial. *See Bellman*, 563 F. App'x at 612 ("[T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; *if it does so*, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement."

17

(emphasis added)).  On this record, there is no disputed fact for a jury to resolve, and a summary trial is therefore not necessary.  *See Parisi v. Okla. Windows & Doors, LLC*, No. 5:23-cv-00115-R, 2024 WL 628468, at *5 (W.D. Okla. Feb. 14, 2024) (finding "no summary trial of factual matters [was] necessary" where the movant "[did] not carry its burden to present sufficient evidence the contract it presented the Court is valid"), *appeal docketed*, No. 24-6043 (10th Cir. Mar. 14, 2024); *Mason v. Midland Funding LLC*, 815 F. App'x 320, 328 (11th Cir. 2020) (motion to compel arbitration could be "denied as a matter of law without the need for a trial" where the movant failed to provide competent evidence of an arbitration agreement).  Indeed, to the extent Petitioner may have inadvertently omitted pages from the Statutory POA that might create a genuine dispute of fact necessitating a trial, it was Petitioner's burden, by asking this Court to compel arbitration, to adequately present its case to the Court in the first instance.  It is not entitled to a second opportunity to re-raise its arguments with better supporting materials.  *Cf. Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (rejecting the notion that "a party cannot lose a motion to compel arbitration for failure to prove that an arbitration agreement exists without being afforded a second bite at the apple—an opportunity to prove the agreement's existence at trial").  And to the extent Petitioner does not possess the potentially missing pages of the Statutory POA, the Court again notes that Petitioner agreed that no discovery was necessary in this case.  [Doc. 24 at ¶ 3].

In sum, Petitioner has not met its burden of showing a valid arbitration agreement exists.  The Motion to Compel Arbitration is respectfully **DENIED**, and Petitioner's Amended Petition is respectfully **DISMISSED**.

18

## CONCLUSION

Therefore, **IT IS ORDERED** that:

(1)    The Motion to Compel Arbitration [Doc. 26] is **DENIED**;

(2)    The First Amended Petition to Compel Arbitration [Doc. 10] is **DISMISSED**;

(3)    Respondent is entitled to his costs associated with this federal case under

Local Rule 54.1; and

(4)    The Clerk of Court is directed to close this case.

DATED:  July 29, 2024                              BY THE COURT:

Nina Y. Wang
United States District Judge

19